No. 84-298

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

---

IN THE MATTER OF THE ESTABLISHMENT
AND ORGANIZATION OF THE WARD
IRRIGATION DISTRICT.

---

APPEAL FROM:    District Court of the Fourth Judicial District,
                In and for the County of Ravalli,
                The Honorable Robert M. Holter, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

                Loble & Pauly; Lester Loble, II, Helena, Montana

        For Respondent:

                Recht & Greef; Charles H. Recht, Hamilton, Montana

---

                        Submitted on Briefs:  Jan. 10, 1985

                                   Decided:  June 13, 1985


Filed:    JUN 13 1985

*Ethel M. Harrison*

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

This is an appeal from an order of the District Court of the Fourth Judicial District, Ravalli County, adjudicating the control over the Bray Lane Headgate in the Ward Irrigation District, Ravalli County, Montana. We affirm in part, reverse in part, and remand.

The following is a map of the area:



Hayes Creek and Camas Creek both flow easterly from their origins in the Bitteroot Mountains. Hayes Creek ends in a marshy area to the west of Highway 93 and south of Camas Creek. To the south is Lost Horse Creek, and to the east, the Bitteroot River. A ditch used by the Ward Irrigation District runs from the Bitteroot River, picks up Lost Horse Creek water, runs by Hayes Creek, and continues until it joins Camas Creek. During high water, Hayes Creek spills out into the ditch. In most years, this spillage does not continue past the middle of July. Subsequent to its confluence with Camas Creek, the combined creek-ditch follows the natural bed of Camas Creek. As with Hayes Creek, Camas Creek generally only contributes water to the ditch during high water. The ditch then runs past the Bray Lane Headgate.

The Foss family referred to in this opinion consists of: John Foss, Millo Huggans, Alice Foss, and other successors in interest to Sam Foss, Sr. They own a ranch of approximately 500 acres in the Bitterroot Valley that includes parts of sections 26, 34, and 35 of Township 5 North, Range 21 West, M.P.M. About 130 acres of the Foss ranch is included in the Ward Irrigation District. The Fosses have decreed water rights for their land from Hayes Creek, Camas Creek, and the Bitteroot River. The existence of these rights is not in dispute. The Foss' land included in the Ward Irrigation District has water rights from Camas Creek and the Bitteroot River. The part of the ranch not in the district has water rights from Hayes and Camas Creeks.

Camas Creek flows through section 34 above its confluence with the ditch. Historically, the Fosses diverted their first three Camas rights there. Hayes Creek flows in an easterly direction south of the Foss ranch, and the Hayes

3

Creek water rights, as well as fourth Camas right, were historically diverted at the Bray Lane Headgate.

The Ward Irrigation District was formed in 1938. The District's petition for formation stated as its purpose that:

> ". . . the lands above described, [those included in the District, including, at the time 36 acres owned by Sam Foss] and to be included in the said Ward Irrigation District, are to be irrigated from the water furnished from the Bitteroot River and 1000 inches of water of Lost Horse Creek, and conveyed from the said river by and through that certain ditch known as the 'Ward Ditch' . . . "

Sam Foss was the first signator of this petition. Further, the report of the State Engineer, required by law to accompany any petition for establishment of irrigation districts, stated that:

> ". . . the present proposal is the formation of an Irrigation District only to take over and operate the existing main canal and structures for the transportation and delivery of water to which the lands comprising the district are entitled under individual water rights severally established . . . "

Following its formation, the District has added several parcels of land, including some Foss acreage, to the service area of the Ward Ditch.

Historically, the Fosses have conveyed Camas Creek and Hayes Creek water through the Ward Ditch and the District delivered water to Foss land outside the district through the Bray Lane Headgate. This practice ended in 1979 when the District requested the District Court to prohibit the Fosses from adjusting the Bray Lane Headgate. On May 7, 1979, the District Court granted the District's request and issued a temporary restraining order and order to show cause prohibiting the Fosses from any further diversions at Bray

Lane. The temporary order was continued for four years. In April of 1983, Millo Huggans was held in contempt of court for adjusting the headgate. John Foss was held in contempt on the same basis in August of 1984.

In this action, the Fosses claim that their Hayes and Camas Creek rights existed prior to the formation of the District; that the District is first using Hayes Creek and then Camas Creek as its ditch; and that pursuant to general water law principles and section 85-7-1922, MCA, they should be allowed to divert their waters at the Bray Lane Headgate.

Respondents, the Ward Irrigation District, contend that the sole issue is the right to control the Bray Lane Headgate, an integral part of the District's system. The District claims that the Fosses have never used the Bray Lane Headgate as an exclusive point of diversion, and that they have aquiesced control of all headgates to the District for more than thirty years. Additionally, the District maintains that control of the Bray Lane Headgate is necessary to guarantee adequate water to its members and to prevent misdeliveries and flooding. Finally, the District points out that it has, and will continue to deliver to the Fosses as much water at the headgate as they need.

Trial was held on December 14, 1983. In addition to taking evidence, the District Court judge personally viewed the area. On April 17, 1984, the court entered its findings and conclusions. Because of the complexity of the case, and because appellants put the findings at issue, we quote them at length:

> " . . .
>
> > "2. The District owns an irrigation canal which commences at the Bitterroot River in Section 14, T4N, R21W, M.P.M., picks

up Lost Horse Creek water and then flows in a northerly and sometimes westerly direction for about 3½ miles . . .

"  . . .

"6. The operations of the District are such that the District must have control of the distribution of water throughout the system and particularly at the Bray headgate.  If the District does not have control of the entire system, the result will be misdelivery of water including shortages in some places and floods in the other.  It takes a number of hours to adjust delivery at the various points in the ditch which requires preplanning in operation.

"7. Camas Creek has several appropriations of water from it, including appropriations owned by Sam Foss's successors.  It usually dries up by the middle of july [sic] of each year in the portion of the creek immediately above the place where the District's ditch flows into the bed of Camas Creek. From that point, the District utilizes the creek bed as its main ditch for a short distance.  During the irrigation season no water from Camas Creek runs into or combines with water in the District distribution system.  Sam Foss's successors have no water which would in any way run into the District's system. They have a system higher up Camas Creek for diversion of their Camas Creek water.

"8. Hayes Creek is located South and West of Camas Creek.  Sam Foss's successors claim the right to use the District's canal to convey Camas Creek [sic] [Hayes Creek?] water to their lands, which is the only practical route.  In the past, this route has been used with the permission of the District.  No measuring device has ever been installed to measure Hayes Creek water in or out of the District's canal . . . Past records do show the District in absolute control of the system at all times since the early 1950's.

"9. It is the common practice for individual members of the District to build their own headgates for distributing water from the District ditches to their lands.  After such construction, the District assumes control of the headgate and has authority to operate it.  Neither Sam Foss nor his

6

successors have any right to water flowing into or controlled by the irrigation district except as District members or except by permissive use [sic] of the District.

" . . .

"Now, therefore, the Court concludes:

" . . .

"2. Sam Foss's successors do not have authority by either grant, adverse use or contract to convey Camas Creek or Hayes Creek waters through the distribution system of the District.

"3. In the past, Sam Foss and Sam Foss's successors have flowed Hayes Creek water through the District's canal with permission of the District. In order for them to do so in the future, they must obtain permission of the District . . . "

The appellants raise the following issues:

(1) That section 85-7-1922, MCA prohibits the District from interfering with the Foss family's use of the Bray Lane Headgates;

(2) That the channelization of Hayes and Camas Creeks does not affect the Foss family's rights;

(3) That the District's system uses the natural beds of Hayes and Camas Creeks, and that the rights of users of the natural flow are primary and superior to the convenience and management of the ditch system;

(4) That the findings and conclusions of the District Court that the Fosses do not have water rights at the Bray Lane Headgate are not supported by the evidence; and that

(5) The injuction presently in force is unlawful.

Appellants' brief contains government survey descriptions and maps of the area that allegedly show that the District's ditch is actually Hayes Creek, until it converges with Camas Creek, and after that point that it

7

follows the Camas Creek bed. Respondents object to appellants' inclusion of these survey descriptions and maps because they were not introduced as evidence before the District Court. Appellants contend the use of the descriptions and maps is proper under Rule 201(b), Mont.R.Evid. because they present facts "not subject to reasonable dispute." We will consider these documents for two reasons. First, the Comment to Rule 201 provides that "judicial notice can be taken at any stage of the proceeding, and includes within its scope "published maps or charts" Commission Comments, Rule 201, Mont.R.Evid. Secondly, the Montana Water Code specifically provides that in the adjudication process, maps and descriptions are acceptable articles of evidence by which to show a water right. See section 85-2-224(2), MCA.

We are mindful, though, that in our consideration of the description and maps, we must also give weight to the District Court's findings, particularly since the judge physically viewed the area. In Grimsley v. Estate of Spencer (Mont. 1983), 670 P.2d 85, 40 St.Rep. 1585, we stated the standard of review in an equity case such as this:

> "In examining the trial court's Decree, we are entitled to review all questions of fact arising upon the evidence in the record, and determine the same, as well as questions of law. . . In so doing, however, we have always indulged certain presumptions in favor of the trial court's determination. We do not substitute our judgment for that of the trial court; rather, we determine whether there is substantial evidence to support the lower court's findings. . . " 670 P.2d at 94, 40 St.Rep. at 1595.

See also 79 Ranch, Inc. v. Pitsch (Mont. 1983), 666 P.2d 215, 40 St.Rep. 981.

Moving to the substantive issue, as the late Professor Wells A. Hutchins, in his treatise <u>Water Rights Laws in the Nineteen Western States</u> (1971) notes:

> "The purpose of an irrigation organization is to provide water for the use of agricultural lands that cannot be irrigated by individual means as conveniently or economically as by a group enterprise, if at all . . . " <u>Hutchins</u>, supra at 550, 551.

But, a district cannot be formed unless its members are willing to part with some of their rights, particularly the right to control the distribution system. Generally, what occurs is that by authority of the Order establishing an irrigation district, the rights to claim and use water under water rights appurtenant to lands included within a district are conveyed thereto. The rights that the district received by authority of the court Order, or other rights subsequently developed, "are held . . . in trust for the performance of their several functions," <u>Hutchins</u>, supra at 551; see also 45 Am.Jur.2d, Irrigation, §62; but:

> ". . . even if the holders do convey their water rights to the company for the mere purpose of convenient management and distribution of the water to users according to their respective rights, there is no severance of the right from the land to which it was appurtenant." <u>Hutchins</u>, supra at 552.

The most important function of an irrigation district is the control, to the mutual advantage of all the members, of the irrigation system. Indeed, though water rights remain with the private appropriator, the prerogative of control must lie exclusively with the district. For this reason, a district court has the limited power, (subject to the withdrawal provision in section 85-7-107(b), MCA) when considering a petition for the formation of an irrigation

9

district, to include or exclude lands depending on whether such lands and their appurtenant water rights are essential to the efficacy of the proposed district, see 85-7-107, MCA; In Re Pet for Org. & Est. of an Irr. Dist. (Mont. 1984), 680 P.2d 944, 41 St.Rep. 658, (The Daly Ditch Case); Scilley v. Red Lodge-Rosebud Irr. Dist. (1928), 83 Mont. 282, 272 P. 543.

Appellants contend that section 85-7-1922, MCA prohibits the District from interfering with the Foss family's control of the Bray Lane Headgate necessary to utilize their Hayes and Camas Creek rights. Addressing the powers and duties of irrigation districts, that section states:

> "Regulation, supervision, apportionment, and control of water distribution. In addition to all other powers granted them by the laws of Montana, boards of commissioners of all irrigation districts, now or hereafter organized under any law of this state, shall have the power and authority to regulate, supervise, apportion, and control the furnishing and delivery of water through the distribution system of the district. Such authority to regulate, supervise, apportion, and control shall not apply to users who have water rights or ditch rights, established, acquired by court decree, use, appropriation or otherwise, at the time or prior to the organization of such district, without regard to whether said distribution system or any portion thereof belongs to the district or to the owner of lands served by said district."

This provision was enacted in 1935 as a general amendment to the Water Use Act, see Sec. 2, Ch. 63, L. 1935. It was meant to cover situations where an irrigation district is formed and begins the distribution of water and its system overlays existing streams, ditches, and headgates. Section 85-7-1922, MCA, does two things: First, it gives an

irrigation district the exclusive right to regulate and control its distribution system. Second, it prohibits a district from controlling its distribution system in a manner that detrimentally affects other water rights over which the district has no control. As such, it is a restatement of the common law rule that:

> "An irrigation district acquiring a system which has theretofore furnished water to settlers outside of the district, who had a vested right thereto, is compelled to continue to deliver such water." Yaden v. Gem. Irr. Dist. (Id. 1923), 216 P. 250, 252.

See also, The Daly Ditch Case, supra; Koch v. Colvin (1940), 110 Mont. 594, 105 P.2d 334; Maclay v. Missoula Irr. Dist. (1921), 90 Mont. 344, 3 P.2d 286.

The above discussion points out the two distinct aspects of the district's functions: control of the irrigation system, and delivery of water to where it is due. Here, the District Court in the 1938 Order establishing the Ward Irrigation District, granted the District exclusive control over the described distribution system--including the Bray Lane Headgate. The same order also effected a transfer of control of the water rights appurtenant to the lands included within the district. It did not affect those water rights appurtenant to lands not included in the district but nonetheless served by the same system. As to those, the District did, and still does, have a continuing obligation to deliver that water in the amount and nature of the use existing before the District was formed.

We have recognized this common-sense proposition before. In The Daly Ditch Case, supra, we noted:

> "There does appear then to be an obligation, the exact nature of which we do not here attempt to determine, on the

11

> part of the newly-organized Daly Ditches
> Irrigation District, if it intends to use
> the points of diversion and rights of
> appropriation appurtenant to the lands of
> Skalkaho Creek exchange users for the use
> and benefit of other land owners, to
> provide substitute water in exchange to
> the exchange water users . . . If the
> exchange water users join the district,
> they will receive a credit on their
> assessment to be determined at a later
> time. If they do not join, the exchange
> water users have left to them all legal
> or equitable remedies if water is not
> delivered to them." 680 P.2d at 948,
> 949, 41 St.Rep. at 663, 664.

We rule that the Ward Irrigation District was granted and has the exclusive right to control the Bray Lane Headgate. We therefore affirm the District Court on that point. This right to control, though, is subject to certain conditions. The District must deliver the amount of water that is appurtenant to lands outside the District including the Foss lands, in the same nature and amount that was delivered prior to August 10, 1938. In this regard, the District's right to control the Bray Lane Headgate is subject to the District Court's equity power to work a reasonable accommodation between the two interests. Further, the Fosses have the protection of both legal and equitable remedies to insure that the District delivers the water to which they are entitled. Since the District Court did not make a determination for the purpose of this action of what water rights are appurtenant to what lands, and in that regard the control of which ones that were conveyed to the District, and which were not, we remand this case for further proceedings consistent with this opinion.

We note though, that the Foss' first three Camas Creek rights were historically diverted above where Camas Creek and the Ward Ditch converge. These are still available to them

12

at their original point of diversion. See Galiger v. McNulty (1927), 80 Mont. 339, 260 P. 401; Smith v. Duff (1909), 39 Mont. 382, 102 P. 984. Since the District Court, in Finding number 7, found that the District uses Camas Creek as its ditch subsequent to where it and the ditch meet, the Fosses are not precluded from applying for a change in the place of diversion or use pursuant to section 85-2-402, MCA.

We overrule the District Court's Conclusions number 2 and 3, the portion of Finding number 9 inconsistent with this opinion. and those parts of the Order dependent thereon. The Fosses may if they choose, convey their Camas and Hayes Creek water rights in the same manner and amount established prior to 1938. The District has the obligation to deliver that water. If any measuring device is required, it should be the District's responsibility. This holding does not do violence to section 85-7-1925, MCA. That statute only applies to lands included within irrigation districts. Further, if it appears now that the ditch is too small to service District and other private water rights, and a larger one is needed, the Fosses should not be required to bear any burden of expansion. They were there first, and are entitled to exercise all of the property rights that they have not surrendered, or have had taken by court order.

As to appellant's issues number two and three; since we reverse the District Court's conclusions numbers 2 and 3, and remand this cause for further proceedings consistent herewith, we do not address them at this time.

Issue number four was generally discussed in the context of issue number one. Appellants have the right to have delivered to them by the District the waters allowed them for water rights not within the District, and for water

to which they are entitled as members of the District. The District has exclusive control of the Bray Lane Headgate. To that extent, we affirm the District Court on this issue.

Finally, as to issue number five, other than affirming the District Court's order, we find it at this point to be moot. John Foss has been cited for contempt for violating the provisions of the District Court's temporary restaining order. The issue of the legality of the injunction on which John Foss was found in contempt is presently before this Court in a separate action.

The District Court is affirmed in part, reversed in part, and the case is remanded for further proceedings in accordance with this opinion. Each party shall bear its own costs.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

14